# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

ARCTIC CAT, INC.,

        Plaintiff,

v.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 13-146 (MJD/JSM)
**FILED UNDER SEAL**

SABERTOOTH MOTOR GROUP, LLC,
and SABERTOOTH MOTORCYCLES, LLC,

        Defendants.

---

Laura L. Myers and Lora Mitchell Friedemann, Fredrikson & Byron, PA, Counsel for Plaintiff.

Ashley M. Bennett Ewald, Daniel J. Ringquist and Dean C. Eyler, Gray Plant Mooty & Bennett, Counsel for Defendant.

---

## I.   INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims.  [Docket No. 207]   The Court heard oral argument on May 15, 2015, in Minneapolis.

## II.   BACKGROUND

A.      **Factual Background**

1.      **The Parties**

Plaintiff Arctic Cat ("Arctic Cat") is a Minnesota corporation that designs

and manufactures snowmobiles, ATVs, and side-by-side vehicles under the

Arctic Cat brand name.  ([Docket No. 67] Declaration of John Tranby ("Tranby

Decl.") ¶ 2.)  Defendants Sabertooth Motor Group, LLC and Sabertooth

Motorcycles, LLC (collectively "Sabertooth") manufacture custom motorcycles

that contain a V8 engine.  ([Docket No. 53] Answer ¶ 8, p. 11.)  Ben Daniels

("Daniels") is President and owner of Sabertooth.  ([Docket No. 221] Declaration

of Ben Daniels ("Daniels Decl.") ¶ 1.)  Michelle Saipe ("Saipe") is the Marketing

Director of Sabertooth.  ([Docket No 222] Declaration of Michelle Saipe ("Saipe

Decl.") ¶ 1.)

2.      **Arctic Cat's Wildcat Snowmobiles**

In the 1980s, Arctic Cat introduced a Wildcat Snowmobile.  (Tranby Decl. ¶

4.)  Arctic Cat stopped manufacturing Wildcat snowmobiles in 1996.  ([Docket

No. 225] Declaration of Dean C. Eyler ("Eyler Decl.") Ex. 7, p. 15.)  Arctic Cat did

not renew its Wildcat mark in 2000.  (Eyler Decl., Ex. 8, Arctic Cat Inter Office

Memo - Trademark Registration List, p. 26.)

### 3.      Sabertooth's Wildcat Motorcycles

In November 2005, Daniels formed VX Unlimited, Inc., ("VX"). ([Docket No. 77] Declaration of Ben Daniels ("Daniels Decl.") ¶ 3.)  In December 2005, VX filed an application for registration of the trademark "Wildcat" for use with motorcycles.  (Eyler Decl., Ex. 3., Trademark Application.)  In addition to the Wildcat trademark, VX obtained federal registrations for several variations of the Wildcat mark for use with motorcycles, including "Wildcat," "Sabertooth Midnight Wildcat," "Wildcat 427," "Wildcat X," and "Wildcat 427 X" (collectively "the Wildcat Marks").  (Id., Ex. 1, Federal Registrations.)  In June 2006, VX became Breedlove Motor Works, LLC.  (Daniels Decl., Ex. 4, Certificate of Formation.)  In September of 2006, Breedlove Motor Works, LLC, converted to Breedlove Motorcycles (hereafter, collectively, "VX/Breedlove"). (Id., Ex. 5, Certificate of Amendment.)

In November 2006, Daniels formed Sabertooth Motorcycles, LLC.  (Id. ¶ 6; Ex. 6, Certificate of Formation.)  On December 5, 2006, Sabertooth acquired all of VX/Breedlove's assets, including the Wildcat trademark application.  (Id. ¶¶ 7, 8; Ex. 7, Asset Purchase Agreement.)

### 4. Sabertooth Motorcycle Sales

Sabertooth began selling Wildcat frames and chassis in January 2006. (Daniels Decl. ¶¶ 63-67; Ex. 23.)  Since 2006, when it sold several Wildcat frames and rolling chassis, Sabertooth has sold at least three Wildcat motorcycles in each calendar year.  (Daniels Decl., Ex. 25, Invoice Summary.)  Sabertooth motorcycles have ranged in price from approximately $30,000 to $50,000.  (Id., Ex. 27.)  In total, Sabertooth's gross sales exceed $1,000,000.  (Id. ¶ 70.)  Sabertooth's motorcycles typically do not display the Wildcat marks.  (Daniels Decl. ¶ 71.)

### 5. Sabertooth Motorcycle Advertising

By April 2007, Sabertooth had transported each of its five Wildcat models to trade shows.  (Id. ¶ 29.)  At the trade shows, potential customers filled out contact information sheets and were encouraged to order Wildcat motorcycles on-the-spot or custom-made.  (Id. ¶¶ 36-40.)  Between 2006 and 2008, Sabertooth transported Wildcat-branded motorcycles to at least 35 trade shows.  (Id. ¶ 28.)

In addition, Sabertooth has advertised Wildcat motorcycles on its official website since early 2006.  (Id. ¶ 56; Ex. 21.)  Its motorcycles have been featured in motorcycle publications and on an MTV2 television show.  (Id. ¶¶ 58, 60, 62; Ex. 22.)  Sabertooth has invested nearly $590,000.00 in advertising.  ([Docket No. 210] Declaration of Laura Myers ("Myers Decl."), Ex. 25, Ans. to Interrog. No. 13.)

4

### 6.      Arctic Cat's Wildcat Side-by-Sides

### a)      Application to the USPTO

In 2010, Arctic Cat began discussing names for a new line of side-by-side

vehicles.  (Myers Decl., Ex. 7.)  Arctic Cat claims that it selected the name

"Wildcat" for the side-by-sides partially because of the company's prior use of

the word with snowmobiles.  (Id., Ex. 8, p. 27.)  On April 29, 2011, Arctic Cat

applied to the United States Patent and Trademark Office ("USPTO") for use of

the Wildcat name with its side-by-sides.  ([Docket No. 79] Affidavit of Daniel J.

Ringquist ("Ringquist Aff.") Ex. 1.)  In September 2011, a trademark examiner

rejected Arctic Cat's application due to a perceived likelihood of confusion with

Sabertooth's Wildcat registrations.  (Id., Ex. 2.)  The USPTO issued a final refusal

to register Arctic Cat's Wildcat trademark application in May 2012.  (Id., Ex. 4.)

Arctic Cat requested reconsideration of the USPTO's decision, and while the

request was pending, announced its new Wildcat side-by-sides to the public.

(Eyler Decl., Exs. 17,  19.)  Arctic Cat appealed the final refusal, but the USPTO

issued a final denial of request for reconsideration.  (Id., Ex. 6.)

### b)      Arctic Cat Sales of Wildcat Side-by-Sides

Arctic Cat sold its first Wildcat side-by-side in December 2011. (Myers

Decl., Ex. 12.)  Starting prices for Arctic Cat's side-by-sides range from

approximately $12,000 to $24,000.  ([Docket No. 211] Declaration of John Tranby

("Second Tranby Decl.") ¶ 8.)  In December 2012 and January 2013, Arctic Cat

announced new "Wildcat 4," "Wildcat X," and "Wildcat 1000X" models.  (Eyler

Dec., Ex. 19.)  From 2011 to 2014, Arctic Cat sold over 12,000 Wildcat side-by-

sides, totaling more than $160 million.  (Myers Decl., Ex. 12.)  Each Wildcat side-

by-side displays the Wildcat mark and the Arctic Cat house mark.  (Second

Tranby Decl. ¶ 9.)

### 7.    Sabertooth Introduces Trikes

In September 2014, Sabertooth introduced two new lines of Wildcat trikes.

(Daniels Decl. ¶ 85.)  Several powersports publications reported on the

announcement of Sabertooth Wildcat trikes.  (Id., Ex. 28.)  Sabertooth plans to

begin selling its trikes during the 2015 calendar year.  (Id., ¶ 85.)

### B.    Procedural Background

On January 16, 2013, Arctic Cat filed the instant lawsuit against Sabertooth.

Sabertooth then asserted counterclaims, alleging Count 1:  Trademark

Infringement (Wildcat Marks); Count II:  Trademark Infringement (Cathead

Logo); Count III: Trademark Infringement: Sabertooth Mark; Count IV: Violation

of the Minnesota Deceptive Trade Practices Act; and Count V:  Unfair

Competition (Common Law).  [Docket No. 53]  On August 16, 2013, Arctic Cat

6

filed an amended complaint, adding four new claims for cancellation of the

Wildcat registrations based on Sabertooth's improper trademark assignment,

non-use of the marks, and fraud.

On August 25, 2014, Arctic Cat filed an initial Motion for Summary

Judgment against Sabertooth's counterclaims.  Arctic Cat argued that

Sabertooth's Wildcat trademarks were unlawfully obtained for lack of EPA

certification, amongst other reasons.  The Court denied Arctic Cat's motion in its

Memorandum of Law & Order [Docket No. 227] dated March 31, 2015.

Arctic Cat brings this second Motion for Summary Judgment on

Sabertooth's counterclaims, arguing that, as a matter of law, there is no

likelihood of confusion between the parties' Wildcat marks.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate

when "there is no dispute of fact and where there exists only one conclusion."

Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.      Infringement Claim

Count I of Sabertooth's counterclaim alleges Arctic Cat's infringement of

its Wildcat marks.  Section 43(a) of the Lanham Act, codified at 15 U.S.C.

1125(a)(1), creates a civil cause of action for trademark infringement.  In order to

prove a violation under the Act, a plaintiff must prove first that it has a right in

the marks that the law will protect, and second that Defendant's use of the marks

is likely to cause confusion.  See Dream Team Collectibles v. NBA Properties,

Inc., 958 F. Supp. 1401, 1411 (E.D. Mo. 1997).

### C.      Likelihood of Confusion

In determining whether a likelihood of confusion exists, the Court

considers the following factors:  (1) the strength of the trademark; (2) the

similarity between the marks in dispute; (3) the competitive proximity of the

parties' products; (4) the alleged infringer's intent to confuse; (5) evidence of

actual confusion; and (6) the degree of care reasonably expected of potential

customers.  Duluth News-Tribune v. Mesabi Publishing Co., 84 F.3d 1093, 1096

(8th Cir. 1996) (citation omitted).

At the summary judgment stage, the Court uses these factors as a guide to determine if a reasonable jury could find a likelihood of confusion.  Id. "Whether likelihood of confusion exists is ultimately an issue of fact, however, factual disputes regarding a single factor do not preclude a court from entering summary judgment."  Dream Team, 958 F. Supp. at 1411 (citation omitted).

**D.     Reverse Confusion**

Sabertooth alleges that this case presents a textbook example of "reverse confusion."  The Eighth Circuit has not explicitly adopted the doctrine of reverse confusion, and only one Court of Appeals opinion references it.  See Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc., 41 F.3d 1242, 1246 (8th Cir. 1994) (explaining—without adopting—the doctrine of reverse confusion while affirming the judgment of the district court).  Thus, in ruling on Arctic Cat's motion for summary judgment, the Court relies on district court precedent within the Eighth Circuit, cases from our sister circuits, and the leading legal treatise on the topic of reverse confusion.

**1.     Reverse Confusion as Compared to Forward Confusion**

The traditional pattern of classic 'forward confusion' occurs when customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services.  Customers want to buy the senior user's product and because of the similarity of marks, mistakenly

9

buy the junior user's product instead.   In 'reverse confusion,' customers purchase the senior user's goods under the mistaken impression that they are getting the goods of the junior user.   That is, reverse confusion occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user:   the reverse of traditional confusion.

J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, § 23:10 (4th ed. 2014).  The result of reverse confusion "is that the senior user loses the value of the trademark, its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new marks."  <u>Id.</u>

Importantly, in a case of reverse confusion, the six-factor "likelihood of confusion" analysis is modified as necessary.  <u>See, e.g.,</u> <u>Mars Musical Adventures, Inc. v. Mars, Inc.,</u> 159 F. Supp. 2d 1146, 1149-50 (D. Minn. 2001) (citation omitted).

## 2.    Strength of the Wildcat Mark

Since in a reverse confusion case, the junior user is <u>not</u> trying to take a free ride on the recognition value of a strong, senior mark, there is no reason to apply the standard requirement that the senior user have a mark strong enough that confusion will result.  Rather, the court should evaluate the strength of the junior user's mark so as to gauge its ability to overpower the senior user's mark.

<u>McCarthy on Trademarks</u>, § 23:10 (emphasis added).

10

Arctic Cat—the junior user—has shown its ability to overwhelm Sabertooth in the market through its commercially successful introduction of Wildcat side-by-sides and subsequent expansion of the Wildcat line.  Since 2011, Arctic Cat has sold over 12,000 Wildcat side-by-sides, totaling more than $160 million.  These circumstances increase the strength of Arctic Cat's Wildcat mark.

Comparatively, Sabertooth has grossed only $1 million in sales.  A reasonable jury could find that Sabertooth's media and trade show advertising have not afforded its Wildcat marks the strength needed to prevent Arctic Cat from swamping Sabertooth's reputation in the powersports market.  Therefore, the Court concludes that this factor weighs in favor of finding a likelihood of confusion.

### 3.    Similarity of the Marks

"In the Eighth Circuit, the use of dominant identical words in common does not mean that the two marks are similar; the Court must evaluate the impression each mark leaves in its entirety."  <u>Mars Musical</u>, 159 F. Supp. 2d at 1151 (citation omitted).  "In determining the similarity of two marks, the Court may consider the marks' visual, aural, and definitional attributes and compare the trade dress of the products in determining whether the total effect conveyed by the two marks is confusingly similar."  <u>Plasti Dip Int'l v. Rust-Oleum Brands</u>

11

Co., Civ. No. 14-1831, 2014 U.S. Dist. LEXIS 174560, at *8 (D. Minn. Dec. 16, 2014)

(quotation marks and citation omitted).

Arctic Cat argues that because it prominently displays the "Arctic Cat"

house mark on its vehicles and promotional materials, the possibility of

consumer confusion is greatly diminished.  Plasti Dip, 2014 U.S. Dist. LEXIS

174560, at *12 ("[U]se of different colors and typefaces, as well as the prominent

display of the house marks convey perceptible distinctions between the

products.") (citation omitted).  However, other circuits have held that, in reverse

confusion cases, use of a house mark may aggravate—rather than mitigate—

consumer confusion.  See, e.g., A & H Sportswear v. Victoria's Secret Stores, 237

F.3d 198, 230 (3d Cir. 2000) (finding that a house mark may aggravate reverse

confusion by reinforcing the association of the disputed mark with the junior

user); McCarthy on Trademarks § 23:10 ("The junior user's use of a well-known

national house mark along with the smaller senior user's mark could strengthen

a viewer's link of the mark with the senior user.")

In light of the above, the Court determines that this factor weighs in favor

of finding a likelihood of confusion, due to an identical aural impression and

Arctic Cat's prominent display of its house mark on its Wildcat side-by-sides.

### 4.    Relatedness of the Parties' Products

"Reverse confusion will not be likely if the goods or services of the parties are not competitive, the respective markets are separated and the advertising of the parties is directed at different types of purchasers."  <u>McCarthy on Trademarks</u> § 23:10 (4th ed.).  This is because, if only a small segment of the senior user's customers are familiar with junior user's mark, there can be no "overwhelming" of the senior user's good will.  (<u>Id.</u>)

The parties do not dispute that motorcycles and side-by-sides are both powersports market products.  As the USPTO noted in its rejection of Arctic Cat's Wildcat trademark application, several of Arctic Cat's competitors— including Honda, Yamaha, Kawasaki, Suzuki, BRP, and Polaris—sell both motorcycles and side-by-sides.  (<u>See</u> Eyler Decl., Ex. 14, Attached Online Excerpts.)  Although there is no evidence of overlap in distribution or sales outlets, a reasonable jury could very easily conclude that motorcycle and side-by-side owners are the same "type" of purchaser.  Moreover, Sabertooth has produced compelling evidence suggesting that a substantial segment of powersports customers are familiar with both the Arctic Cat Wildcat and Sabertooth Wildcat marks.  At the very least, this evidence creates a material

issue of fact as to a likelihood of confusion regarding the source of the parties'

Wildcat-marked goods.

### 5.     The Alleged Infringer's Intent to Confuse

In reverse confusion cases, courts in the Eighth Circuit have followed the

Third Circuit's analysis of the "intent to confuse" factor.  See, e.g., Rainforest

Café v. Amazon, Inc., 86 F. Supp. 2d 886, 899-900 (D. Minn. 1999) (citing Fisons

Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 474 (3rd Cir. 1994)); Dream

Team, 958 F. Supp. at 1415 (adopting the Fisons "intent to confuse" analysis);

Mars Musical, 159 F. Supp. 2d at 1152.  Under the Third Circuit's line of

reasoning, the Court considers "whether the defendant was aware of the senior

user's mark when it adopted its own mark, and whether the defendant

considered that its adoption of the mark might result in confusion."  A&H

Sportswear, 237 F.3d at 232.  In determining intent, however, the Third Circuit

has rejected a "mere carelessness" standard in favor of a traditional "deliberate

intent" standard.  Id.; Minn. Specialty Crops, Inc. v. Minn. Wild Hockey Club,

LP, Civil No. 00-2317, 2002 U.S. Dist. LEXIS 13991, at *27 (D. Minn. July 26, 2002)

(closely following Third Circuit precedent by adopting traditional standard to

determine defendant's intent to mislead consumers).  The Court may also

consider whether Arctic Cat deliberately intended to push Sabertooth out of the

market when it adopted the Wildcat mark for side-by-sides.  Freedom Card, Inc.
v. JPMorgan Chase & Co., 432 F.3d 463, 479 (3d Cir. 2005).

Sabertooth has presented evidence that Arctic Cat introduced and
expanded its line of Wildcat snowmobiles despite Sabertooth's registrations for
Wildcat X, Wildcat 427, and Wildcat 427 X, and despite the USPTO rejecting its
applications due to a likelihood of confusion.  Nevertheless, nothing within the
record would lead a reasonable factfinder to conclude that Arctic Cat intended to
mislead or confuse customers by selecting the term "Wildcat."  Nor is there any
evidence to suggest that Arctic Cat intended to push Sabertooth out of the
market.  On balance, therefore, the Court determines that this factor favors
neither party.

### 6.      Evidence of Actual Confusion

"Proof of actual confusion can provide positive evidence of a likelihood of
confusion."  Mars Musical, 159 F. Supp. 2d at 1151 (citation omitted).  To show
actual confusion, Sabertooth has produced evidence from internet forums;
testimony from powersports dealers and consumers; and testimony regarding
misdirected phone calls and emails.

### a)      Internet Forum Posts

Sabertooth claims that consumers and dealers have confused Sabertooth's Wildcat goods (or planned goods) with Arctic Cat's.  A thread on an Arctic Cat Wildcat Forum entitled "Wildcat trike," which has had at least 9,000 views, contains statements from persons who express confusion about Sabertooth's Wildcat trike plans.  For instance, on August 9, 2013, a Wildcat Forum member by the name of "jm22351" posted the following:

> Does anyone know about arctic cats new wildcat trike?  I got these pics of what I heard arctic cats new wildcat trike from my riding buddy and contacted arctic cat for more info.  This is the response I got:
> I am sorry, but I cannot release any information on future models at this time.  However, any models that we would release would be compliant for all regions.

(Eyler Dec., Ex. 34.)

On August 16, 2013, a user named "Bushman4" wrote:

> I found these pics of Arctic Cat's new Wildcat trikes on the Wildcat forum.  They have both conventional and RT models.  Anyone know anything about these?  I'd love to find out more about them.



(Id.)  In response, forum member "RoadBoss" wrote:

Releasing some "spy" picture of a new product without many details is a cleaver [sic] way of creating buzz and gauging customer interest for a relatively low cost, although by no means unique or original.  I am a bit skeptical about Arctic Cat as a company however their lines of Wildcat motorcycles and ATVs are pretty impressive so I have hope for the Wildcat trikes.

(Id.)

Likewise, on August 30, 2013, forum member "TrailKing" posted:

[T]his Sabertooth motorcycles has to be an arctic cat project.  It makes sense that arctic cat would set up some sort of an independent company to develop new products like trikes.  i still think yamaha has to be involved in some way.

(Id.)  On September 6, 2013, Wildcat Forum member "wildgeorge" wrote:

I just went on sabertooths site and its obvious they came from arctic cat.  Sabertooth has a trike that looks almost identical to the arctic cat trike . . . sabertooths logo looks almost the same as arctic cats . . . . [T]here is no way this didnt come from arctic cat.

(Id.)

On August 27, 2013, "RoadBoss" wrote that he had found a picture of one of Arctic Cat's Wildcat trikes.  The user then posted this picture of a Sabertooth Wildcat trike:



(Id.)

Arctic Cat argues that Sabertooth's internet forum evidence is inadmissible

hearsay.  See Mars Musical, 159 F. Supp. 2d at 1151 ("In reverse confusion cases,

only admissible evidence can be considered by the Court at the summary

judgment stage.") (citing Duluth News-Tribune, 84 F. 3d at 1098).  Importantly,

however, Sabertooth's online forum evidence is not offered to prove the truth of

the matters asserted.  Rather, the evidence "presents statements and questions

made that demonstrate rather than explicitly assert confusion."  Rainforest Café,

86 F. Supp. 2d at 902 (citation omitted).  Therefore, the Court determines that the

forum posts are admissible evidence.  That being said, the accuracy and weight

of the forum posts are for a factfinder to determine.

### b)     Misdirected Emails and Phone Calls

Courts have found that customer inquiries to the senior user regarding

affiliation with a junior user may be relevant and admissible.  See e.g., Rainforest

Café, 86 F. Supp. 2d at 902 (citation omitted); Arrezzi, LLC v. Maytag Corp., 436

F.3d 32, 40 (1st Cir. 2006).  Sabertooth Marketing Director Michelle Saipe testified

that she received calls with inquiries related to Arctic Cat's Wildcat product line,

demonstrating that the caller had a misunderstanding about Sabertooth's

affiliation with Arctic Cat.  (Eyler Decl., Ex. 37 at pp. 93-94.)  Other callers

allegedly inquired about repair services for Wildcat ATVs and other ATV-related

issues.  (Id.)  Sabertooth claims that all of these calls were in reference to Arctic

Cat's Wildcat side-by-sides.  Again, the Court determines that Sabertooth's

misdirected emails and phone calls are not offered for the truth of the matter

asserted, and are probative of the declarant's confusion.   The evidence creates a

genuine issue of material fact for the purposes of summary judgment.

### 7.    Degree of Care Expected of Consumers

In reverse confusion cases, a greater degree of care exercised by purchasers

may weigh in favor of a finding of likelihood of confusion.  Dream Team, 958 F.

Supp. at 1417.  "Ultimately, the purchaser who takes more care may choose not

to purchase the product based upon his or her concern that it is the product of an

unauthorized infringer, whereas it is likely of little concern to the purchaser of an

inexpensive product whether or not the product is that of an unauthorized

infringer."  Id.

However, in <u>Mars Musical Adventures</u>, another reverse confusion case, this Court evaluated the "degree of care" factor in a traditional manner, with a greater degree of care weighing against finding a likelihood of confusion.  <u>See</u> 159 F. Supp. 2d at 1153.  Other courts have followed suit.  <u>See, e.g.</u>, <u>Tovey v. Nike, Inc.</u>, Case No.: 1:12-CV-448, 2014 U.S. Dist. LEXIS 93899, at *61-63 (N.D. Ohio May 1, 2014); <u>RIPL Corp. v. Google Inc.</u>, No. 2:12-CV-02050-RSM, 2014 WL 1350810, at *10 (W.D. Wash. Apr. 3, 2014).

Clearly, courts have handled this factor differently, suggesting that its application is highly fact-specific.  Applying the law to the facts of the instant case, the Court finds that this factor weighs slightly in favor of finding infringement.  Arctic Cat's side-by-sides range from approximately $12,000 to $24,000, and Sabertooth's custom motorcycles range from approximately $30,000 to $50,000.  Because a purchaser may employ a great degree of care before purchasing such an expensive product, a reasonable jury could find a likelihood of confusion.

Weighing the six factors as a whole, the Court finds that genuine issues of fact preclude summary judgment on Sabertooth's infringement counterclaim.   With the exception of the "intent to confuse" factor, all remaining

factors weigh in favor of finding a likelihood of confusion.  Thus, the Court will

deny Arctic Cat's motion on Sabertooth's Count I:  Trademark Infringement

(Wildcat Marks).

### E.    Trademark Rights in the Wildcat Mark for Clothing

Sabertooth has also asserted a claim for trademark infringement based

upon use of the Wildcat mark with clothing.  "[A] common-law trademark arises

from the adoption of actual use of a work, phrase, logo, or other devise to

identify goods or services with a particular party."  <u>First Bank v. First Bank Sys.</u>,

84 F.3d 1040, 1044 (8th Cir. 1996) (citations omitted).  Arctic Cat argues that

Sabertooth has no documentary evidence that it sold any clothing bearing the

Wildcat mark.  Sabertooth responds by pointing to the testimony of witnesses

regarding the sales of t-shirts, polo shirts, hats, and other items.  (Eyler Decl., Ex.

37 at 20-25; Ex. 38 at 78, 81-84.)  The Court finds that this testimony creates a

dispute of material fact sufficient to overcome Arctic Cat's motion for summary

judgment.

### F.    The "Cat Head Logo" and Sabertooth Mark

 

21

Sabertooth's Count II alleges Arctic Cat's use of its leaping cat logo infringes Sabertooth's trademark rights under the Lanham Act.  According to Arctic Cat, there is no likelihood of confusion as to the parties' marks, and Sabertooth has not alleged any evidence of actual confusion.  However, the Court notes that Arctic Cat's Complaint alleges that its Leaping Cat Logo is confusingly similar to the Sabertooth Cathead Logo.  ([Docket No. 1] Complaint ¶ 13.)  Sabertooth also produced the "wildgeorge" forum post, wherein the user comments about the similarity between the parties' logos.  In light of this evidence, the Court concludes that fact questions remain as to whether the logos are likely to cause confusion.

As for the "Sabertooth graphics kit," Arctic Cat argues that the use of the term "Sabertooth" is merely descriptive and constitutes fair use, but fails to cite to any authority.  Therefore, the Court finds that Arctic Cat has not met its burden in proving the absence of disputed facts regarding whether its use of the "Sabertooth Graphics Kit" infringes Sabertooth's trademark rights.  The Court will deny summary judgment on Count III:  Trademark Infringement (Sabertooth mark).

### G.    Deceptive Trade Practices Act Claim

Sabertooth has also asserted a claim for violation of the Deceptive Trade Practices Act.   A plaintiff seeking relief under the Minnesota Deceptive Trade Practices Act ("MDTPA") must show a likelihood of confusion among consumers that has resulted from the defendant's violation of the MDTPA.  See LensCrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481, 1489–90 (D. Minn. 1996); Minn. Stat. § 325D.44, subd. 2.

Arctic Cat argues that Sabertooth's MDTPA claim fails for the same reasons that its infringement claim fails.  See, e.g., Coyne's & Co. v. Enesco, LLC, Civil File No. 07-4095, 2010 U.S. Dist. LEXIS 83630, at *42 (D. Minn. Aug. 16, 2010).  Because the Court denies Arctic Cat's motion for summary judgment on Sabertooth's infringement claim under the Lanham Act, the Court also denies summary judgment on Sabertooth's MDTPA claim.  Id.

### H.    Unfair Competition

"Unfair competition is not a tort with specific elements; it describes a general category of torts which courts recognize for the protection of commercial interests" including "product disparagement," "tortious interference with contractual interests and improper use of trade secrets."  Zimmerman Grp., Inc. v. Fairmont Foods of Minn., Inc., 882 F. Supp. 892, 895 (D. Minn. 1994). Likelihood of confusion is an element of common law unfair competition.  See

Mars Musical, 159 F. Supp. 2d at 1153.  Therefore, just as the Court has found

that genuine issues of material fact exist as to Sabertooth's infringement claims,

the same must be true of Sabertooth's unfair competition claim.  Cf. id. (granting

summary judgment on infringement claim necessitates dismissal of unfair

competition and deceptive trade practices claims).

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Plaintiff Arctic Cat's Motion for Summary Judgment [Docket No.
207] is **DENIED.**


Dated:   September 25, 2015          s/ Michael J. Davis
                                     Michael J. Davis
                                     United States District Court