## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| ARCTIC CAT, INC., | Civil No. 13-146 (JRT/JSM) |
| Plaintiff/Counter Defendant, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| SABERTOOTH MOTOR GROUP, LLC and SABERTOOTH MOTORCYCLES, LLC, | |
| Defendants/Counter Claimants. | |

Laura L. Myers, Lora Mitchell Friedemann, and Nikola L. Datzov, **FREDRIKSON & BYRON, PA**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, for plaintiff.

Dean C. Eyler and Loren L. Hansen, **GRAY PLANT MOOTY**, 80 South Eighth Street, Suite 500, Minneapolis, MN 55402, for defendants.

In 2013, Plaintiff Arctic Cat, Inc. ("Arctic Cat") initiated this trademark case against Defendants Sabertooth Motor Group, LLC and Sabertooth Motorcycles, LLC (collectively "Sabertooth"), and Sabertooth counterclaimed. The case is now on the eve of trial. The Court has three of Arctic Cat's pre-trial motions before it: two motions to exclude testimony, and one motion to strike Sabertooth's jury demand and to bifurcate the trial. The Court will grant Arctic Cat's motion to exclude Melissa Snelson's testimony, because her opinion about a hypothetical royalty rate as a basis for Sabertooth's damages is too speculative to be useful to the jury; deny and defer Arctic Cat's motion to exclude Demetri Melekos's testimony, because Melekos is a fact witness and Arctic Cat's relevancy concerns would be better addressed at a later time; grant

Arctic Cat's request to strike Sabertooth's jury demand, because none of Sabertooth's viable claims are protected by the Seventh Amendment; and deny Arctic Cat's request to bifurcate the trial, because the Court does not find that two trials would result in increased efficiencies or improve judicial economy, and could result in unwarranted prejudice to Sabertooth.

## BACKGROUND

### I.    FACTUAL BACKGROUND

Numerous orders have been issued in this case.  (*See, e.g.*, Order and Op., Mar. 31, 2015, Docket No. 227.)  Many of the facts are not in dispute.  The Court will therefore summarize the facts to the extent necessary to provide context for and decide the present motions.

Arctic Cat is a Minnesota corporation that designs, manufactures, and markets snowmobiles, all-terrain vehicles, and side-by-sides under the Arctic Cat brand name. (*Id.* at 2.)  Sabertooth Motor Group, LLC and its wholly-owned subsidiary Sabertooth Motorcycles, LLC are Delaware LLCs with their principal places of business located in Massachusetts.  (*Id.*)  Ben Daniels is the president and owner of Sabertooth.  (*Id.*) Sabertooth sells custom-made V8 motorcycles.  (*Id.*)

In 2005, Daniels founded a company called "VX Unlimited, Inc.," and a month later filed twenty-five trademark applications for use of the "Wildcat" mark on motorcycles, motorcycle parts, and clothing.  (*Id.* at 2, 4.)  Through various business

formalities, Daniels formed Sabertooth and had Sabertooth purchase what remained of VX, including the Wildcat trademark application.  (*Id.* at 6.)

In each calendar year since 2006, Sabertooth has sold at least three of its Wildcat motorcycles, each with a price of $30,000 to $50,000.  (Order and Op. ("Sept. Order") at 4, Sept. 25, 2015, Docket No. 241.)  Sabertooth has spent nearly $590,000 advertising its product and company.  (*Id.*)

In 2010, Arctic Cat selected "Wildcat" as the name for its new side-by-side vehicle line.  (*Id.* at 5.)  Arctic Cat applied to the USPTO to use the Wildcat mark, but the USPTO denied the application in May 2012.  (*Id.*)  Arctic Cat sold over $160 million of Wildcat side-by-sides between 2011 and 2014, both before and after the USPTO's decision.  (*Id.* at 5-6.)

## II.     PROCEDURAL BACKGROUND

Arctic Cat filed its complaint on January 16, 2013, alleging claims of trademark infringement, deceptive trade practices, and unfair competition.  (Compl. ¶¶ 26-43, Jan. 16, 2013, Docket No. 1.)  Arctic Cat later added four trademark cancellation claims. (Am. Compl. ¶¶ 75-90, Aug. 16, 2013, Docket No. 17.)  Sabertooth counterclaimed with five claims of its own:  three for trademark infringement under the common law and the Lanham Act (Counts I, II, and III), one for violation of Minnesota's Deceptive Trade Practices Act (Count IV), and one for unfair competition (Count V).  (Ans. to Compl. and Countercl. ¶¶ 77-102, Aug. 9, 2013, Docket No. 16; Ans. to Am. Compl. and Countercl. ("Countercl.") ¶¶ 77-102, Aug. 30, 2013, Docket No. 18.)

On July 28, 2014, Sabertooth's expert Melissa Snelson issued an initial report. (Decl. of Lora M. Friedemann ("Friedemann Decl."), Ex. A ("Initial Snelson Report"), Oct. 26, 2015, Docket No. 251.)  Snelson's initial report contained a discussion of how she would calculate Sabertooth's damages based on a hypothetical royalty rate that, in Snelson's view, was comparable to what Sabertooth would have received had it licensed its mark to Arctic Cat instead of Arctic Cat infringing on the mark.  (*Id.* at 12-13.)  But Snelson did not actually calculate that rate – she merely described how she would calculate it if she had sufficient information, which she stated she did not; Snelson said in that initial report that she needed examples of Arctic Cat's licensing of similar trademarks to complete her analysis.  (*Id.* at 13.)  Snelson's initial report did however mention Sabertooth's past licensing of some of its marks to a man named Dan Parker.  (*Id.* at 12-13.)  Snelson's initial report indicated that the Sabertooth-Parker licensing agreement required Parker to pay Sabertooth 25% of his net profits earned by the retail sales of products bearing the licensed marks.  (*Id.*)  Snelson stated that Parker paid Sabertooth "a few thousand dollars" under the agreement, which is now expired.  (*Id.* at 13.)

Around the close of discovery on November 1, 2014, Arctic Cat disclosed to Sabertooth four trademark licensing agreements that Arctic Cat was or had been a party to.  On February 5, 2015, Snelson issued an "updated" report, this time including a calculation of what she deemed to be a reasonable estimation of the royalty rate Sabertooth would have received from Arctic Cat.  (Friedemann Decl., Ex. E. ("Updated Snelson Report") at 14-23.)  Snelson based her calculation in part on three of the four

license agreements that Arctic Cat had recently disclosed.  (*Id.* at 15-17.)[1]  Two of the licensing agreements involved Arctic Cat licensing its marks to third parties – one agreement covered cold weather footwear and the other involved "ride-in" toy vehicles – and the third had Arctic Cat paying to use Remington trademarks on Arctic Cat's ATV accessories.  (*Id.* at 15-16.)  Snelson's updated report concluded that had Sabertooth agreed to license its marks to Arctic Cats, that agreement would have permitted Arctic Cat to use the marks in return for the payment of a royalty of 2% to 5% of net sales to Sabertooth.  (*Id.* at 23.)  Such an agreement would have resulted in Arctic Cat owing Sabertooth royalties of $3,364,700 to $8,411,748, according to Snelson.  (*Id.*)

On October 26, 2015, Arctic Cat moved the Court to exclude the testimony of Snelson and Melekos.  (Mot. to Melekos's Testimony, Oct. 26, 2015, Docket No. 245; Mot. to Snelson's Testimony, Oct. 26, 2015, Docket No. 248.)  Then on November 18, 2015, Arctic Cat filed another motion to bifurcate the trial and strike Sabertooth's jury demand.  (Mot. to Bifurcate and Strike Jury Demand, Nov. 18, 2015, Docket No. 264.)  Those motions are now pending before the Court.

## ANALYSIS

### I.   SNELSON

Arctic Cat has moved the Court to exclude Snelson's testimony at trial.  Federal Rule of Evidence 702 permits an expert to testify about an expert opinion if

---

[1] Arctic Cat disclosed four licensing agreements, but Snelson was not able to determine an effective royalty rate for one of the four agreements.  (Updated Snelson Report at 17.)

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Cole v. Homier Distrib. Co.*, 599 F.3d 856, 865 (8th Cir. 2010) (quoting *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1060 (8th Cir. 2002)) ("Expert testimony is admissible if it is reliable and will help the jury understand the evidence or decide a fact in issue."). "Although the factual basis of an expert's opinion is generally an issue of credibility rather than admissibility, an expert's opinion should be excluded if it 'is so fundamentally unsupported that it can offer no assistance to the jury.'" *Id.* (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001)).

A number of courts have applied Rule 702 to permit the introduction of evidence of a purportedly reasonable hypothetical royalty rate, for purposes of calculating monetary relief, where the hypothetical rate is based on prior licensing agreements between the parties in the litigation or involving the licensing of the at-issue marks to other parties. *See, e.g.*, *Sands, Taylor & Wood v. Quaker Oats Co.*, 978 F.2d 947, 959-60, 963 (7th Cir. 1992) (suggesting it would be acceptable to calculate a hypothetical royalty rate based on licensing agreements of the at-issue marks with third-parties); *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1519-20 (11th Cir. 1990) (permitting the calculation of a hypothetical royalty rate based on the royalty rate used in

the parties' expired franchise agreement).  But courts are less willing to permit the use of hypothetical royalty rates where the rate-estimate is based on some other basis.  *See, e.g., A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 208-09 (3d Cir. 1999) (finding no justification for the hypothetical royalty rate).

Here, Snelson's report falls in the latter category, not the former.  She based her calculation in large part on the three licensing agreements that Arctic Cat disclosed in late 2014, but there is little indication that those licensing agreements have any bearing on what Arctic Cat would have paid to Sabertooth for Sabertooth's marks, for at least three reasons:  First, none of the marks involved in those licensing agreements are at issue here in this case.  Second, Sabertooth is not a party to any of the agreements; they all involve Arctic Cat and some other party.  And third, two of the three agreements involve Arctic Cat licensing its marks to a third party, not a third party licensing its marks to Arctic Cat, as would be analogous to Sabertooth's case.

Sabertooth makes two arguments against this conclusion worth discussing here. First, Sabertooth notes that one of the three agreements on which Snelson relied involved Arctic Cat licensing the Remington mark for ATV accessories.  Sabertooth points out that its hypothetical agreement with Arctic Cat would have been Arctic Cat licensing its mark for something akin to ATV accessories too, and so, in Sabertooth's view, the Arctic-Cat-Remington agreement is a valid basis for Snelson's calculation.  But the Court finds this one agreement insufficient to demonstrating the helpfulness of Snelson's proposed royalty rate.  Arctic Cat and Remington are established, storied companies with well-known marks, while Sabertooth is a new-to-the-market company; it is highly unlikely

that an agreement with Sabertooth would have looked similar to Arctic Cat's agreement with Remington.

Second, Sabertooth points to an unpublished case from the District of Maryland for the proposition that the reliability of Snelson's calculation and its factual bases is a matter properly addressed on cross examination, and should not result in her testimony being excluded in the entirety. *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, No. 08-2764, 2010 WL 1375301, at *7-8, *8 ns. 21-25 (D. Md. Mar. 30, 2010). But *Coryn* was a very different case than this one. Most notably, in this case the Court has before it the Sabertooth-Parker agreement, which strongly undercuts the reliability of Snelson's calculation, while no similar contradictory agreement existed in *Coryn*. Under the Sabertooth-Parker agreement, Sabertooth agreed to license the very marks at issue here to a third party, Dan Parker. The Sabertooth-Parker agreement required Parker to pay a 25% royalty – far higher than the 2% to 5% suggested by Snelson – and yet Parker apparently paid only a few thousand dollars at most under the agreement, a far cry from the $3 to $8 million Snelson suggests as appropriate monetary relief. Given the fact that Sabertooth actually licensed the at-issue marks under a 25% royalty scheme and received no more than a few thousand dollars, then a hypothetical royalty rate of 2% to 5%, netting $3 to $8 million, based on royalty agreements not involving Sabertooth and not involving the at-issue marks, is far too speculative – so speculative that it would offer no assistance to the jury.

The Court will therefore exclude Snelson's expert testimony. Because of the Court's findings as to Snelson's hypothetical royalty rate, the Court need not reach Arctic

Cat's argument that Snelson's royalty-rate opinion be excluded because her updated report was arguably untimely.

## II.    MELEKOS

Arctic Cat also moves the Court to exclude Melekos from testifying.  In its memorandum supporting its motion, Arctic Cat based almost all of its argument on why, in its view, Melekos could not testify as an expert.  It was only in the final pages of its brief that Arctic Cat argued, in the alternative, that Melekos should not be permitted to testify as a fact witness, because his testimony would purportedly be irrelevant. Sabertooth conceded in its brief in opposition to the motion that Melekos was not an expert witness, only a fact witness, and that if Sabertooth were to call Melekos he would not testify about expert opinions.  If he testifies, Melekos would apparently speak of Sabertooth's efforts to comply with EPA regulations.

In light of Sabertooth's clarification that Melekos will not testify as an expert, Arctic Cat's only remaining concerns are the relevancy of his testimony.  The Court will not rule on those relevancy objections today, however.  Those objections are better addressed in the context of trial, and the Court will defer its decision on those matters until trial.

Arctic Cat also made a disclosure-related argument against Melekos's testimony, because Sabertooth only disclosed Melekos on the eve of the close of discovery. Sabertooth represents that it disclosed Melekos so late because it was only then that it became apparent that Arctic Cat intended to raise Sabertooth's compliance with EPA

regulations as a subject in the litigation.   Arctic Cat argues Sabertooth's late disclosure constituted negligence or something worse.   The Court will not, however, exclude Melekos's testimony on the basis of the timing of his disclosure.   Although Sabertooth disclosed Melekos late in the process, the disclosure was before the close of discovery, and Arctic Cat has offered no reason why Arctic Cat is unduly prejudiced by the late disclosure to any extent that cannot be remedied by cross examination.

The Court will therefore deny Arctic Cat's motion to exclude Melekos from testimony in part, with respect to his purported expert testimony, and defer ruling on Arctic Cat's relevancy objections until trial.

## III.   JURY DEMAND

Arctic Cat next requests that the Court strike Sabertooth's jury demand.   The Seventh Amendment to the U.S. Constitution provides in relevant part, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right by jury shall be preserved."   U.S. Const. amend. VII.   Courts applying the Seventh Amendment's jury-right provision must ask two questions:   (1) "whether [the court is] dealing with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was," and if the answer is yes, then (2) "whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791."   *City of Monterey v. Del Monto Dunes at Monterey, Ltd.*, 526 U.S. 687, 708 (1999) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376 (1996)).

On the first line of inquiry, the Supreme Court has noted, "The Seventh Amendment . . . applies not only to common-law causes of action but also to statutory causes of action 'analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Id.* (quoting *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348 (1998)).   Thus, if a statutory cause of action is one that would have been heard by a court of equity, instead of a court of law, then the Seventh Amendment's right to a jury does not apply.[2]

Here, Sabertooth would have a valid jury demand if Snelson is permitted to testify, because her testimony supports Sabertooth's demand for damages on its federal trademark claims in Counts I, II, and III.   But because the Court finds that Snelson may not present her expert testimony, Sabertooth lacks the ability to press its claim for damages, and Sabertooth must root its jury demand in some other cause of action. Sabertooth identifies two other causes of action that it believes carry a right to a jury. First, Sabertooth argues its demand for an accounting of profits triggers the Seventh Amendment's right to a jury.   Sabertooth requests in its counterclaim "[t]hat the Court order Arctic Cat to account for and pay over to Sabertooth all gains, profits, and

---

[2] Courts should first determine whether a statute guarantees a right to a jury, before determining whether the Seventh Amendment does, because of a preference for avoiding unnecessary confrontation of constitutional questions. *City of Monterey*, 526 U.S. at 707-08. Here, however, Sabertooth has presented no argument that a statute guarantees it a right to a jury, they have only made the constitutional argument, so the Court must confront the constitutional issue.

advantages derived by it from its infringement and other unlawful acts." (Countercl. at

33.)  The Ninth Circuit addressed this issue with persuasive force just last year:

> A claim for disgorgement of profits . . . is equitable, not legal.
> Litigants filed trademark-like actions in "deceit" prior to 1791, but these
> suits were rare.  *See* Mark A. Thurman, *Ending the Seventh Amendment
> Confusion: A Critical Analysis of the Right to a Jury Trial in Trademark
> Cases,* 11 Tex. Intell. Prop. L.J. 1, 60–63 (2002) (only three known cases
> prior to 1791–two in courts of law, one in court of equity).  While this
> historical record illuminates little, the current law recognizes that actions
> for disgorgement of improper profits are equitable in nature.  *See
> Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558,
> 570, 110 S. Ct. 1339, 108 L. Ed. 2d 519 (1990); *Tull,* 481 U.S. at 424, 107
> S. Ct. 1831; *City of Monterey,* 526 U.S. at 710, 119 S. Ct. 1624 (equitable
> monetary remedies focus on "what . . . the [defendant] gained"); *Reebok
> Int'l, Ltd.,* 970 F.2d at 559 ("An accounting of profits under § 1117(a) is
> not synonymous with an award of monetary damages:  [a]n accounting for
> profits . . . is an equitable remedy subject to the principles of equity."
> (internal quotation marks omitted)).
>
> Contrary to Plaintiffs' argument, *Dairy Queen, Inc. v. Wood,* 369
> U.S. 469, 82 S. Ct. 894, 8 L. Ed. 2d 44 (1962) does not broadly hold that a
> Lanham Act claim for disgorgement of profits is a legal claim.  Rather, the
> Supreme Court characterizes the *Dairy Queen* claim as a legal claim for
> damages (not disgorgement of profits).  *See Feltner,* 523 U.S. at 346, 118
> S. Ct. 1279.
>
> Moreover, even if the claim were legal, the specific issue of profit
> determination cannot be said to be traditionally tried to a jury.  *See City of
> Monterey,* 526 U.S. at 718, 119 S. Ct. 1624.  Again, the slim history of pre–
> 1791, trademark-like cases certainly does not support that notion. Turning
> to current law, § 1117's language allows judges to determine the amount of
> profits, which judges regularly do.  Consequently, the determination of
> profits under § 1117 is not "fundamental, . . . inherent in and of the essence
> of the system of trial by jury." *Tull,* 481 U.S. at 426, 107 S. Ct. 1831.

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075-76 (9th Cir.), *cert.*

*denied*, 136 S. Ct. 410 (2015).  The Court agrees with the Ninth Circuit's analysis and

finds that Sabertooth's accounting of profits demand does not trigger a right to a jury.

Second, Sabertooth argues that Arctic Cat's Sherman Act cancellation claim (Am. Compl. at 17) is legal and guarantees Sabertooth a right to a jury trial.  The Court is aware of no binding precedent on the matter, but the bulk of district courts to consider this argument have found a cancellation claim to be equitable.  *See, e.g.*, *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, No. 12-7992, 2014 WL 185222, at *14-15 (S.D.N.Y. Jan. 16, 2014) (stating a cancellation claim is equitable, not legal, and does not give rise to a right to a jury trial); *Empresa Cubana Del Tabaco v. Culbro Corp.*, 123 F. Supp. 2d 203, 209 (S.D.N.Y. 2000) (same); *see also Neva, Inc. v Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533, 1549 (M.D. Fla. 1990) (not giving cancellation claims to the jury even though a jury trial was held).  The Court finds the reasoning in these cases persuasive:  "A cancellation order is similar to other equitable orders issued by a court that require recall of infringing materials, which have been held to be wholly equitable in nature." *Empresa*, 123 F. Supp. at 209.

Sabertooth focuses its argument on a 2002 opinion in *3M v. Shurtape Tech., Inc.*, No. 98-2134, 2002 WL 1000089, at *2-4 (D. Minn. Mar. 14, 2002).  But the court's opinion in that case is not helpful to Sabertooth's cause.  In that case, the court addressed a party's request for a separate bench trial, not a motion to strike a jury demand.  *Id.* at *1.  And it was undisputed in that case that at least some of the claims to be tried were legal.  *Id.* at *2.  The court even acknowledged that courts do, at times, try trademark cancellation claims based upon fraud to the bench instead of the jury.  *Id.*  Thus, although the court there concluded that it could try both the non-legal and the legal claims together to a jury, the court's ruling was based primarily on judicial economy and the lack of any

overriding reason requiring a bench trial – not a finding that cancellation claims triggered a Seventh Amendment right to a jury. *See id.*

Sabertooth therefore lacks a viable claim to trigger a right to a jury, and the Court will grant Arctic Cat's request to strike Sabertooth's jury demand.

## IV.  BIFURCATE TRIAL

Finally, Arctic Cat requests that the Court hold two different trials, one on Arctic Cat's cancellation claims and one on Sabertooth's infringement claims.  "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.  When ordering a separate trial, the court must preserve any federal right to a jury trial."  Fed. R. Civ. P. 42(b).  The Court has broad discretion in deciding whether to hold separate trials.  *O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1201-02 (8th Cir. 1990).  However, a court may abuse its discretion in ordering separate trials if the bifurcation of the trials "is unfair or prejudicial to [any] party."  *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 964 (10th Cir. 1993).

Here, Arctic Cat argues that holding separate trials would serve policies of judicial economy and reduce the cost of litigation because if Arctic Cat were to win its cancellation claims in the first trial there would be no need to hold a second trial – Sabertooth's infringement claims would be moot.  But Sabertooth of course argues just the opposite:  Arctic Cat is not likely to win on its infringement claims, and two trials is more work than one trial for the Court and the parties.  The Court agrees.  Any purported

efficiencies in holding separate trials depends entirely on the outcome of the first trial, and it is not the Court's role to engage in such speculation.  Additionally, bifurcation could result in unfair prejudice to Sabertooth because the Court's focus could be unfairly focused on Arctic Cat's cancellation argument first, instead of on all of the claims, all of the arguments, and the broader context of the case.  Finally, many trademark cases contain both cancellation claims from one party and infringement parties from the other, just as many patent cases involve claims of validity and infringement; carrying Arctic Cat's argument to its logical extreme could require the Court to hold two trials in every one of those instances.  That deviation from the normal course of federal litigation would impose great additional costs on the courts.  The Court declines to start down that path.

The Court will deny Arctic Cat's request to bifurcate the trial.  This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Arctic Cat's Motion to Exclude Expert Testimony of Demetri Melekos [Docket No. 245] is **DENIED** with respect to expert testimony and **DEFERRED** with respect to Arctic Cat's relevancy objections.

2.     Arctic Cat's Motion to Exclude Expert Testimony of Melissa Snelson [Docket No. 248] is **GRANTED**.

3.     Arctic Cat's Motion to Bifurcate Trial and Strike Jury Demand [Docket No. 264] is **DENIED** with respect to the request to bifurcate and **GRANTED** with respect to the request to strike Sabertooth's jury demand.

DATED:  August 9, 2016
at Minneapolis, Minnesota.

_____s John R. Tunheim_____
JOHN R. TUNHEIM
Chief Judge
United States District Court